UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOUGLAS N. TABOR, JR.,

                Plaintiff,                        CASE NO. 03-70243

-vs-                                        PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

ELECTRONIC DATA SYSTEMS, INC.,
and METROPOLITAN LIFE INSURANCE
COMPANY

                Defendants.
_____/

**ORDER:**
**(1) GRANTING DEFENDANT EDS' MOTION FOR SUMMARY JUDGMENT; AND**
**(2) AFFIRMING DEFENDANT METLIFE'S DECISION TO DENY PLAINTIFF'S**
**CLAIM FOR LONG TERM DISABILITY BENEFITS**

**BACKGROUND:**

        Douglas N. Tabor ("Plaintiff") filed his complaint in Wayne County Circuit Court on

December 30, 2002 against EDS alleging:

        (1) Breach of contract;

        (2) Discrimination and interference with the attainment of disability benefits in violation
        of §510 of the Employee Retirement Income Security Act of 1974 ("ERISA");

        (3) Disability discrimination pursuant to Michigan Persons with Disabilities Civil Rights
        Act  and the American with Disabilities Act.[1]

        On January 2, 2003, this case was removed by Defendant Electronic Data System

("EDS")  to this Court.  On January 20, 2004, Plaintiff amended his complaint to add

---

        [1]Plaintiff's Michigan Persons with Disabilities Civil Rights Act and the American with
Disabilities Act claims were dismissed with prejudice on December 10, 2003.

1

Metropolitan Life Insurance Company ("Metlife") as a Defendant.  Plaintiff alleges that Metlife breached its fiduciary duty and duty of good faith and fair dealing.  (First Amended Complaint, pg. 15).  Plaintiff further alleges that Metlife wrongfully denied Long Term Disability Benefits. (*Id.* at 16).  Plaintiff suffers from multiple sclerosis, which was first diagnosed in 1982. (Plaintiff's Application for Long Term Benefits, Ex. E to Plaintiff's August 10, 2004 dep.)

On January 15, 2000, Plaintiff, an Infrastructure Specialist at EDS was notified by his manager, Joseph Swykert, that he was fired due to reduction in workforce.  (Plaintiff's Aug. 10, 2004 dep. pgs. 6-7; Swykert's dep. pg. 168).  Two hours later, Plaintiff called Swykert and told him he was going to apply for disability benefits from EDS.  (Plaintiff's Aug. 10, 2004 dep. pgs. 93-95; Swykert Decl. ¶12).  After receiving this call, Swykert processed Plaintiff's disability claim.  (Swykert's dep. pg. 148-150).

There are two disability plans at issue in this case.  EDS's Short Term Disability Policy ("STD") is a self funded payroll practice plan designed to provide continued pay to employees for up to 26 weeks in the event of absences in the workplace due to health conditions which render them unable to perform their jobs.  (EDS' Ex. F).   The Long Term Disability Plan's ("LTD") benefits are funded by a group policy of insurance issued by Metlife, who also is the claims administrator for the LTD plan.   The LTD plan provides 60% income replacement for disabilities that extend beyond 180 days.  (Metlife's Ex. A, p. 20).

The claim for both short-term and long term disability benefits was denied.  (EDS's Answer ¶43).  Plaintiff's STD and LTD claims were denied on the same grounds, namely that Defendants determined that Plaintiff's condition did not progress to the degree that he was unable to perform his job on the afternoon of January 15, 2002. EDS, through Metlife issued a

letter denying Plaintiff's STD claim on March 13, 2002.  Plaintiff appealed the denial of his STD

claim.  On May 21, 2002, Metlife denied this claim and stated it was still its opinion "that the

documentation submitted is insufficient to support a claim that Mr. Tabor became total disabled

from performing the duties of his occupation on the afternoon of January 15, 2002."  (Plaintiff's

EDS Response, Ex. Y).

On March 13, 2002, Metlife denied Plaintiff's claim for LTD benefits.  The denial letter

provided:

> Taking all of the available information concerning your client's employment and your
> client's illness into consideration, we find that his illness did not contribute to his loss of
> income in January of 2002.  Your client suffers from the disease multiple sclerosis, and
> has suffered from that illness since 1982.  His disease has undoubtedly progressed since
> it was diagnosed and will undoubtedly progress further in future years.  However, it did
> not progress to the degree that rendered him unable to perform his job as an infrastructure
> specialist for EDS as of the afternoon of January 15, 2002.

(*Id.* Ex. J, pg. 139).

The denial letter set forth that Metlife's LTD policy requires that in order to be eligible

for LTD benefits, Plaintiff had to be unable to earn more than 80% of his Predisability Earnings

at his own occupation for any employer in the local economy during the elimination period (six

months) and continuing for the next 24 month period.  (*Id.* at 135).  The letter further stated that

the loss of earnings must be a direct result of Plaintiff's sickness, or accidental injury and not

from economic factors.  (*Id.*).  The denial letter advised Plaintiff that he could appeal the denial

decision, but Plaintiff never appealed the LTD decision.

Swykert testified that he told Plaintiff his termination was effective immediately on

January 15, 2000.  (Swykert's dep. pg. 145)  Plaintiff testified that Swykert told him his

termination would be effective on January 16, 2000.  (Plaintiff's Aug. 10, 2004 dep. pgs. 6-13).

3

Another Infrastructure specialist, Stella Noskina was notified of her termination on the same day as Plaintiff, and there was no evidence that she suffered from a disability. (Swykert's dep. pgs. 55-55; Swykert Decl. ¶12).

On or about January 16, 2000 Plaintiff received a letter from EDS in the mail from Swykert which stated that as a result of cost reduction activities, EDS has eliminated his position effective January 15, 2000.  (Plaintiff's Ex. I).  EDS offered Plaintiff $6,092.31 in severance conditioned upon Plaintiff signing a Separation Benefits Agreement and Release which *inter alia* would eliminate his ability to receive benefits from EDS.  (*Id.*).  Plaintiff refused to sign the release.

The afternoon of January 15, 2002, Plaintiff visited doctor Bill Fulk, who certified that Plaintiff was unable to work due to his MS.  (Plaintiff's Aug. 10, 2004 dep. pgs. 31-37). Swykert received a copy of Dr. Fulk's letter before the end of the day on January 15, 2002. (Swykert's dep. pg. 153).   Prior to January 15, 2002, EDS had accommodated Plaintiff by allowing him to work from home on his computer.  (Swykert Decl. ¶10).  Plaintiff worked from home in Michigan in the summer months, and from home in Florida in the winter months.  (*Id.* ¶10-11).   Plaintiff was also allowed to alter his schedule to allow for medical appointments. (*Id.*).  Plaintiff had been working from home for several years, and was already working from home when Swykert became his boss.  (Swykert's dep. pgs. 110-114, 127).   Plaintiff cannot recall whether he told Dr. Fulk about EDS' accommodations.  (Plaintiff's Aug. 10, 2004 dep. pg. 56).

Dr. Fulk referred Plaintiff to Dr. Edward Davis, a neurologist in Fort Myers, Florida.  Dr. Davis examined Plaintiff on January 29, 2002.  (Admin. Rec. Ex. P, pgs. 298-299).  Dr. Davis

submitted a report in support of Plaintiff's STD claim on April 16, 2004.  (*Id.* Ex. Q, pg. 227).

Plaintiff testified that he became physically unable to perform his job in October 2000 but did not apply for disability benefits because he wanted to continue supporting his family. (Plaintiff's October 28, 2003 Dep. pgs. 91-98, 109-110).

Dr. Stanton Elias, Plaintiff's treating neurologist provided medical certification and written support of Plaintiff's application for disability benefits.  (Admin. Rec. Ex. B, pg. 155; Ex. C, pg. 293; Ex. D, pgs. 158-159)  Prior to January 15, 2002, the date of Plaintiff's termination,  Dr. Elias had last examined Plaintiff in October 2000.  Thereafter, Dr. Elias examined Plaintiff in August 2002 and stated that Plaintiff would have "continuously fulfilled disability criteria at all times between those two examinations."  (Plaintiff's EDS Response, Ex. B).

Metlife sent Plaintiff's medical records to Dr. Joseph J. Jares, III.  Previously, in processing Plaintiff's claim for STD benefits, Dr. Jares reviewed Plaintiff's claim file.  On March 6, 2002, after review of the documents in Plaintiff's file at that point, Dr. Jares concluded:

> Based on the medical records, from a neurology perspective, Mr. Tabor has a moderate impairment due to objective findings.  The objective findings include his physical examination demonstrating spasticity in his left upper and both lower extremeties, hypereflexia, and extensor plantar signs.  He has moderate dysmetria on finger-to-nose maneuver , and very unsteady gait.  He has reduced vibration, proprioceptive function, and reduced temperature sensation in his lower extremities.  Specific test results are not submitted.  Mr. Tabor retains the ability to work at a sedentary position.  He does have cognitive complaints, but these are not substantiated by the results of any neuropsychological testing.  Mr. Tabor would need to avoid working at heights or around heavy machinery due to his neurological symptoms of unsteady gait.  He would also need to avoid exposure to high environmental temperatures because of the potential of worsening his MS symptoms.  The medical records submitted regarding Mr. Tabor are quite scant.  His previous neurological care is not submitted.

(Metlife's Response, Ex. E, p. 287).

5

Dr. Jaros further stated:

> There is no documented change in Mr. Tabor's neurological status that would suggest that he was unable to perform a sedentary job as of the afternoon of January 15, 2002.

(*Id*).

On May 6, 2002, Dr. Jares issued another report after he received additional medical evidence from Plaintiff.  Dr. Jares provided:

> The additional information submitted includes an office memo addressed to Sam Morgan, [Plaintiff's] Attorney dated 03/25/02 and written by Bill Fulk, M.D. regarding Mr. Tabor's clinical status.  The second piece of information is a letter dated 04/16/02, addressed To Whom it May Concern, written by Edward L. Davis, D.O.  The third piece of information consists of a 2-page summary of Mr. Tabor's difficulties with daily activity.  The author nor date of this summary is not given.  It appears from the information submitted that the office memo written by Dr. Fulk is a recitation of the points made in the 2-page summary, and does not appear to be completely original.  One might assume it was written by Mr. Tabor or a friend or family member and submitted to Dr. Fulk in an attempt to produce his memo.  It is not disputed that Mr. Tabor has impairment due to his multiple sclerosis.  It is unclear, however, why his condition changed so abruptly on 01/15/02 that he was no longer able to do the activities he had been doing up until that date.
>
> There is no concrete or specific clinical information submitted that would shed light on why his functional capacity changed at that point.  If there is other information available regarding his functionality, I would be happy to review this.  The new information submitted does not change my previously submitted opinion of 3/06/02.

(*Id.* Ex. F, pgs. 213-215).

In February, 2003 Plaintiff submitted additional materials in support of his claim for LTD benefits.  On February 12, 2003, Dr. Jares issued his final report and concluded:

> The new clinical information submitted does not change my previously submitted opinions in that mainly Mr. Tabor has been capable of working in a sedentary position.  There are no reports of any abnormal cognitive findings.  Fatigue is a non-quantifiable complaint.
>
> There is no doubt that Mr. Tabor has some degree of disability from his multiple sclerosis but there has not been a dramatic change documented, particularly around the time of January of 2002, which would indicate sudden loss of function.  It appears that the

August 2002, office visit was the most recent visit Mr. Tabor has had, extending back over a year.  This would suggest that his  multiple sclerosis has not dramatically worsened.

(*Id.* Ex. G, p. 148).

Plaintiff also submitted an Family Medical Leave Act ("FMLA") claim.  According to EDS' corporate representative, EDS had a contract with Metlife in 2002 whereby Metlife administered EDS employee requests for benefits under the FMLA.  (Harrington Dep. pgs. 8, 40, 31).  On March 13, 2002, Metlife sent Plaintiff a letter notifying him that his request for FMLA leave due to a serious health condition was granted, and that he was granted an FMLA leave of absence for 4 hours on January 15, 2002. (Plaintiff's EDS Response, Ex. G).  Metlife's letter went further and stated that because he was informed of his separation before he became eligible for FMLA leave, and because he was separated for reasons unrelated to his absence, his FMLA claim ends after the close of business on January 15, 2002.  (*Id.*).[2]

As stated previously, Plaintiff brings his claims against EDS and Metlife.  On December 28, 2004 Metlife filed a motion to Affirm the Administrator's Decision with Regard to Long

---

[2]Plaintiff argues that Metlife's March 13, 2002 letter granting benefits for the afternoon of January 15, 2002 constitutes an admission by EDS' agent Metlife, which is binding on EDS, that Plaintiff was disabled on January 15, 2002.  Plaintiff bases his argument on the FMLA's definition of "serious health condition" which provides: a "serious health condition means an illness, impairment, or physical or mental condition that involves: (1) any period of incapacity or treatment connected with inpatient care in a hospital, hospice, or residential medical care facility; or (2) any period of incapacity requiring absence of more than three calender days from work, school, or other regular daily activities that also involves continuing treatment by (or under the supervision) of a health care provider, or (3) continuing treatment by (or under the supervision of) a health care provider for a chronic or long-term health condition that is incurable or so serious that, if not created, would likely result in a period of incapacity for more than three calender days, and for prenatal care." See 29 U.S.C. § 2101(11) and 29 C.F.R. § 825.114.  The Court, however, finds that under the specific terms of the STD policy, Plaintiff was not eligible for benefits.  Therefore, the Court finds that the FMLA benefits granted to him for the afternoon of January 15, 2002 do not constitute an admission by EDS.

7

Term Disability Benefits or in the alternative, for Judgment on the Administrative Record. EDS also filed a Motion for Summary Judgment and for Entry Affirming Metlife's Decision to Deny Plaintiff's Claim for Long Term Disability Benefits on December 28, 2004. Plaintiff responded to both Motions on January 25, 2005. EDS replied on February 9, 2005 whereas Metlife replied on February 10, 2005. Oral argument was held on April 6, 2005.

### ARGUMENTS

**1.    EDS' Argument**

EDS first argues that Plaintiff is not entitled to STD benefits because the policy is not an enforceable contract. (EDS' Motion, pg. 8). EDS further argues that Plaintiff is not entitled to STD benefits under the STD policy's terms, and therefore summary judgment is proper. (*Id.* at 11). Lastly, Plaintiff argues that Plaintiff has not produced sufficient evidence to survive summary judgment regarding his Section 510 ERISA claim. (*Id.* at 15).

**2.    Metlife's Argument**

Metlife argues that under Sixth Circuit precedent, this Court's review of a fiduciary determination is limited to the evidence presented to the LTD plan's administrator and is to be reviewed under an arbitrary and capricious standard. (Metlife's Motion, pgs. 12-13). Metlife contends that its decision to deny LTD benefits was neither arbitrary or capricious. (*Id.* at 13). Finally, Metlife argues that Plaintiff's claim must be dismissed because he failed to exhaust his administrative appeal procedures. (*Id.* at 20).

**3.    Plaintiff's Argument**

With respect to EDS, Plaintiff argues that the STD policy is an enforceable contract pursuant to the "legitimate expectations" doctrine. (Plaintiff's EDS Response, pg. 17). Plaintiff

also contends that a reasonable jury could find that he was entitled to STD benefits under the terms of the policy as of January 15, 2002. (*Id.* at 18).  Similarly, Plaintiff contends that a reasonable jury could conclude that EDS' actions were taken in least in part to interfere with his attainment of benefits in violation of Section 510.

Regarding Metlife's claims, Plaintiff argues that the "administrative record" in this case will not be complete and subject to review by Metlife until there has been a full adjudication of his wrongful denial of benefits claim against EDS.  (Plaintiff's Metlife Response, pg. 3). Therefore, Plaintiff requests that the Court stay the proceedings on Plaintiff's wrongful denial of benefits claim pending: (1) adjudication of Plaintiff's wrongful denial of STD benefits against EDS, and (2) Plaintiff's subsequent exhaustion of the appellate procedure called for in the LTD plan.  (*Id.* at 3-4).

## ANALYSIS

### 1.      Standard

The Court reviews EDS' Motion for Summary Judgment under Federal Rule of Civil Procedure 56.  Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof."  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial
> responsibility of informing the district court of the basis for its

9

> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd.*

10

*of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the

non-moving party must produce more than a scintilla of evidence to survive summary judgment).

As set forth below, the Court reviews Metlife's Motion to Affirm the Administrative

Decision with Regard to Long Term Disability Benefits or, In the Alternative, for Judgment on

the Administrative Regard under an "arbitrary and capricious" standard.  The Court finds:

> [u]nder the arbitrary and capricious standard, the administrator's claim can be overturned
> only upon a showing of internal inconsistency, bad faith, or some similar ground.  If the
> plan administrator's decision is rational in light of the plan's provisions and reasonable
> with no abuse of discretion, then it must be upheld.

*Racknor v. First Allmerica Financial Life Insurance Company,* 71 F.Supp.2d 723, 729 (E.D.

Mich. 1999) (internal citations omitted).

**B.      Discussion**

**1.      Plaintiff's Breach of Contract Claim under the STD against EDS**

It is undisputed by the parties that EDS' STD policy is a payroll practice policy and is not

governed by ERISA.  Therefore, Michigan law applies and the Court conducts a *de novo* review

of Plaintiff's claim.

Plaintiff alleges that EDS breached a contract by failing to pay him STD benefits.

Plaintiff claims that:

> 89.  EDS's promise to provide STD benefits pursuant to the written STD benefits policy,
> attached hereto as Exhibit A, caused TABOR to develop the legitimate expectation that he would
> receive STD benefits in accordance with that policy.

> 90.  EDS's promise to provide STD benefits pursuant to the written STD benefits policy
> attached hereto as Exhibit A, became part of TABOR's employment contract with EDS.

(Complaint ¶89, 90).

EDS contends that under Michigan law, when an employer reserves its right to make

11

unilateral modifications to its policies, the employer does not "intend to be bound" by such policies.   Therefore, EDS contends Plaintiff's breach of contract claim fails.   EDS points to the language in the EDS Benefits Handbook containing the STD policy which provides: "EDS reserves the right to modify, change, eliminate or add benefit plans at its sole discretion."  (EDS' Ex. 3, Rogers Decl. ¶5).  EDS argues that Plaintiff's claim fails because the STD policy is not an enforceable contract.

EDS contends that no contract existed because there was no mutual assent.  Plaintiff alleges that there is a contract on the basis of his "legitimate expectations" as set forth by the Michigan Supreme Court in *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579 (1980) which provided:

> We hold that employer statements of policy ... can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and, hence, although the statement of policy is signed by neither party, can  be unilaterally amended by the employer without notice to the employee, and contains no reference to a specific employee, his job description or compensation, and although no reference was made to the policy statement in the pre-employment interviews and the employee does not learn of its existence until after his firing.

*Id.* at 614-615.

In *Toussaint,* two plaintiffs, Toussaint and Ebling, brought wrongful discharge actions against their employers.  The Michigan Supreme Court reversed the Court of Appeals in regards to plaintiff Toussaint's claim.   Toussaint's employer's policy manual stated that its employees would be discharged for just cause only.  Toussaint was also orally assured that he would only be fired for just cause.  The defendants argued that it was well settled law that employment contracts for an indefinite term are terminable at the will of either party unless the employee has furnished consideration to his employer other than his services.  Therefore, according to the

defendant, there was no enforceable contract. The Court disagreed, and held a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable, and such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectation grounded in an employer's policy statements.

The Court, however, finds that *Toussaint* has not been extended beyond just cause employment contracts. The Michigan Supreme Court stated in *Dumas v. Auto Club Ins.,* 437 Mich. 521 (1991) the following:

> [g]iven the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances, we conclude that *Toussaint* should not be extended to create legitimate expectations of a permanent compensation plan. Previous cases have not extended the legitimate-expectations theory to facts similar to these, and we decline the opportunity to extend the theory to compensation terms.

*Id.* at 532.

As the Court in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran,* 67 F. Supp. 2d 764 (E.D. Mich. 1999) stated in addressing an argument similar to that of the Plaintiff:

> [t]he fatal fallacy with defendants' argument here, however, is that the Michigan Supreme Court has expressly limited *Toussaint* to the question of whether a just-cause employment contract exists and has refused to extend the decision to construe management policies governing compensation as contractual terms.

*Id.* at 777.

The Court finds that *Toussaint* has not been extended in Michigan beyond whether a just cause employment contract exists, therefore, *Toussaint* does not apply to the instant case. The Plaintiff cites three cases in support of his legitimate expectations theory - - *In re Certified Question (Bankey v. Storer Broadcasting Company,* 432 Mich. 438 (1989), *Rood v. General*

13

*Dynamics Corp.,* 444 Mich. 107 (1993), and *Lytle v. Malady,* 458 Mich. 153 (1998). However, all three of these cases addressed just cause employment contracts.

A basic requirement of contract formation is that the parties mutually assent to be bound. *Rood v. Gen. Dynamics Corp.,* 444 Mich. 107, 118 (1993). EDS contends that Michigan courts have held that where an employer reserves the right to make unilateral modifications to its policies, the employer does not "intend to be bound" by such policies. EDS cites *Heurtebise v. Reliable Bus. Computers, Inc.,* 452 Mich. 405, 414 (1996). In *Heurtebise,* the Michigan Supreme Court held that an employee handbook did not create an enforceable arbitration agreement because the employer did not intend to be bound by the provision contained in the handbook. The Court found that the handbook contained an express disclaimer that it did not create a contract, and that the employer reserved the right to modify the policy in its sole discretion. Accordingly, the Court found that the policy did not create an enforceable contract.

In *Floss v. Ryan's Family Steak Houses, Inc.,* 211 F.3d 306 (6th Cir. 2000), the Court found an arbitration clause unenforceable. In *Floss,* the Sixth Circuit consolidated two plaintiffs' claims. The plaintiffs, as part of their job application with defendant, signed a form indicating that they would arbitrate all employment related disputes. The plaintiffs subsequently brought actions under the American with Disabilities Act and the Fair Labor Standards Act. In both cases, defendants filed a motion to compel arbitration. The Court found the arbitration provision unenforceable because it was based upon an illusory promise. The arbitration provision was subject to a reservation in which third party arbitration services provider retained the right to alter the applicable rules and procedures without any obligation to notify or consent. The Sixth Circuit quoted Professor Williston as follows:

14

> Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement.  The unlimited choice in effect destroys the promise and makes it merely illusory.

(*Id.* at 316 (quoting 1 SAMUEL WILLISTON, CONTRACTS § 43, at 140 (3d ed. 1957).

Similarly here, EDS reserved the unlimited right to later decide the extent of the performance.  The STD policy provides: "EDS reserves the right to modify, change, eliminate or add benefit plans at its sole discretion."  (EDS' Ex. 3, Rogers Decl. ¶5).  Accordingly, the Court finds that the STD is policy is not an enforceable contract because EDS retained the right to modify it, and *Toussaint* has been limited to just cause employment contracts.[3]

---

[3]The Court notes that the rationale behind *Toussaint* applies with equal force to the instant case.  As the *Toussaint* Court stated:

> While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced.  The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly.  No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally.  It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee.  The employer has then created a situation 'instinct with an obligation."

(408 Mich. at 613).  EDS has not terminated or cancelled its STD policy.  EDS processed Plaintiff's STD claim, reviewed evidence in determining whether Plaintiff was eligible to receive benefits, and allowed an appeal of its denial.  At no time during Plaintiff's claim process did EDS disavow its obligations as set forth in the STD policy, it merely denied Plaintiff's claim based upon the terms of the policy.  Under these circumstances, it could be said that EDS created a situation "instinct with an obligation" under *Toussaint*.  However, under Michigan law, the STD policy is not enforceable.   Plaintiff brings his claim under *Toussaint's* legitimate expectations doctrine which has not been extended beyond just cause employment contracts.

Even if the Court were to find that the STD policy was an enforceable contract, the Court still finds that Plaintiff is not entitled to STD benefits under the terms of the STD policy.

EDS claims that it is entitled to summary judgment because under the terms of the policy, Plaintiff was not entitled to receive benefits due to his separation from the company. EDS contends:

> [i]t is undisputed that Plaintiff was informed of his discharge before he ever sought STD benefits, and it also is undisputed that his status as an EDS employee ended before such benefits would have been payable - namely, before the end of the STD policy's five-day waiting period. In short, Plaintiff's absence from work after the effective date of his discharge was not due to any health condition but, rather, was due to the fact of his discharge. Indeed, the STD policy explicitly states that eligibility to receive STD benefits ceases on an employee's last day of employment. Here, Plaintiff's employment ended before any STD benefits would have been payable, and, thus, EDS is entitled to judgment in its favor.

(EDS' Brief, pg. 12).

In addressing the terms of the STD policy, the Court notes that the policy was modified several times by EDS. Plaintiff argues that EDS modified its STD and LTD policies without notice to him.

In December, 2001, EDS amended its STD and LTD policies, effective January 1, 2002. (Plaintiff's EDS Response, Ex. Z). The "waiting period" for the STD policy was amended to include "5 consecutive business days" changed from 5 business days within a continuous 30-day period (whether consecutive or not). (*Id.*). The Maximum Benefit Duration for the STD policy was:

benefits will end on the earliest of the following dates:

-        the end of the Maximum Benefit Duration;

-        the date you are no longer Disabled;

16

- the date you fail to provide us with any of the information requested;

- the day you die.

(*Id.*).

EDS amended its policy again, some time in 2002, effective May 31, 2002.  The May 31, 2002 STD Policy Handbook set forth revised language upon when STD benefits end as follows:

STD benefits for all employees end on the earliest of the following dates:

- The end of the approved maximum benefit duration

- The date the employee is no longer disabled

- The date the employee fails to provide required medical information to support a disability claim

- The date the employee is separated from EDS employment

- The date of the employee's death

- The date the employee is no longer an eligible employee.

(*Id.*).

The modified STD policy provides: "[y]ou must complete the waiting period and meet all other eligibility criteria before you are able to receive STD benefits" and that "[i]f you leave EDS, your eligibility to receive STD benefits will cease on your last day of employment."  (*Id.*).

EDS contends that while it submits that Plaintiff's last day of employment was January 15, 2002 and Plaintiff asserts it was January 16, 2002, the distinction is irrelevant.  EDS contends that STD benefits would not have been payable either way because the policy contained a 5-day waiting period before STD benefits were payable.  Therefore, even if Plaintiff was terminated on January 16, 2002 he was terminated before any STD benefits would have

17

been payable.

EDS contends that Plaintiff's separation from EDS prevented him from fulfilling the threshold requirements necessary to receive STD benefits.  First, the policy only covers absences from work due to a health condition.  Second, the STD policy provides that benefits are payable only after a five day waiting period.  Therefore, Plaintiff had to be absent from work due to a health condition lasting more than 5 days in STD benefits.  After January 15, 2002, Plaintiff was absent from his position not because of a health condition rather because he was discharged, thus making his fulfillment of the five day waiting period impossible.

Plaintiff contends that a reasonable jury could find that the language that your STD benefits end when your employment ends was not added until May 31, 2002.  Plaintiff also contends that a reasonable jury could conclude that Plaintiff was disabled from his job and occupation more than 5 days before his employment ended.  Plaintiff contends that he met all the eligibility requirements under EDS' policy when he made his claim on January 15, 2002, and that he at least should have been paid STD benefits until May 31, 2002, if not for the entire 26 weeks after January 15, 2002.

Plaintiff cites Paul Landry, an EDS Benefits Consultant testimony in support of his claim that he was entitled to STD benefits.  Landry testified to this issue as follows:

Q.  And did the short term policy of EDS as it existed in 2002 allow for an employee to report their disability more than a day after the disability started?

A.  Yes.

Q.  Okay.  So if I was an employee of EDS in January - - on January 15 of 2002, the short term disability policy, as it existed then, did allow me to apply for short term disability more than one day after the disability started?

A.  Yeah, eligible employees, that would be correct.  For eligible employees.

18

(Landry Dep. pgs. 87-88).

However, the Court notes that Landry's testimony assumes that the employee was eligible for STD benefits.  As explained below, the Court finds that Plaintiff was not an eligible employee under the STD plan.  Therefore, the Court finds that Landry's testimony does not create a question of fact as to whether Plaintiff was initially entitled to STD benefits.

The Court finds that even under the STD policy as it existed in 2001, there is no genuine issue of material fact as to whether Plaintiff was entitled to benefits.  The 2001 Handbook provides that you must be an employee of EDS to be eligible to participate in the STD.  (*Id.* at 79).  The handbook also states that there is a five-day waiting period before an employee is eligible to receive STD benefits.  It provides as follows:

> [t]he 'waiting period' is the minimum length of time in which you must be disabled due to the same medical condition during a continuous 30-day period to qualify for STD benefits.  It begins on the first day you become unable to work and lasts up to a maximum of five business days.  During this time, STD benefits are not payable.  <u>You must complete the waiting period and meet all other eligibility criteria before you are able to receive STD benefits.</u>

(*Id.* at 80).  (Emphasis added).

The Court finds that Plaintiff was not eligible to receive benefits on January 15, or 16, 2002 because his employment was separated because he was discharged, and not because of a health condition under the policy.  The 2001 handbooks states:

> EDS' [STD] benefits are provided to protect your income if you are unable to work due to an illness, injury or pregnancy for which you are receiving appropriate care and treatment.

(*Id.* at 79).

The policy further states:

Absences eligible for STD benefits are those that last a minimum of five (5) business

19

days within a continuous 30-day period (whether consecutive or not) for the same
condition during which you are unable to perform your work even on a modified level.
Your inability to work must be a direct result of your illness, pregnancy or injury.

(*Id.*).

The Court finds under a plan reading of the policy, that Plaintiff was not eligible for STD

benefits.  The Court finds that Plaintiff was not absent for five business days due to his health

condition.  The Court finds that Plaintiff was absent or separated from EDS due to his discharge.

Contracts must be enforced as written and according to its plan meaning when its terms are

unambiguous.  *The Soc'y of St. Vincent De Paul in the Archdiocese of Detroit v. Mt. Hawley Ins.*

*Co.,* 49 F. Supp.2d 1011, 1016 (E.D. Mich. 1999).  Further, when a contract contain conditions

precedent, those conditions precedent must be satisfied before liability is imposed.   *Lane v.*

*Amoco Corp.,* 133 F.3d 676, 677-78 (8th Cir. 1998).

In *Lane v. Amoco Corp.,* the Court addressed similar facts to the instant case.  The *Lane*

Court held that an employee was not entitled payment under her employer's bonus plan because

she failed to satisfy the eligibility criteria of "active employment" as required under the plan.

Similarly, in *Lott v. Hertz Custom Benefit Program,* 1992 U.S. App. LEXIS 6828, *6 (10th Cir.

April 9, 1992) (unpublished) the Court stated:

In this case, the written provisions of the HCBP that require an employee be "active at
work" on or after July 1, 1987, are a valid and unambiguous condition precedent to
eligibility.  It is uncontested that Lott was not actively at work on or after July 1, 1987.
Accordingly, for the reasons just stated we conclude that the defendants' course of
conduct cannot amend or modify the terms of this ERISA-governed benefit plan.

(*Id.* at *6).

Thus, the Court holds that under the plain terms of the STD policy, Plaintiff was not

eligible to receive benefits.  Accordingly, for the reasons set forth above, the Court grants EDS'

20

motion for summary judgment.

### 2. Plaintiff's Section 510 ERISA Claim against EDS

Section 510 of ERISA, 29 U.S.C. § 1140, prohibits "interference with the attainment of any right to which the participant may be entitled." Plaintiff contends that EDS terminated him in order to deny him benefits under the terms of EDS' LTD plan. Plaintiff alleges that EDS "violated § 510 of ERISA by terminating TABOR with the intent and purpose of interfering with, and depriving TABOR of the attainment of those benefits TABOR otherwise would have been entitled to receive under the EDS Long Term Disability program." (Complaint ¶83).

To establish a *prima facie* Section 510 ERISA case, the Plaintiff mst show that there was (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employer may become entitled. *Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1043 (6th Cir. 1992). Further, the Plaintiff must demonstrate that EDS had specific intent to discharge Plaintiff for the purpose of interfering with the attainment of the LTD benefits. *Nixon v. Celotex Corp.,* 693 F.Supp. 547, 555 (W.D. Mich. 1988).

The Court in addressing Section 510 claim, follows the *McDonnell Douglas*[4] burden shifting framework developed under Title VII in determining whether the Plaintiff has met his burden to provide discriminatory intent. *Humphreys v. Bellaire,* 966 F.2d at 1043 (6th Cir. 1992). Under *McDonnell Douglas* a plaintiff has the initial burden of proving a prima facie case of prohibited action by a preponderance of the evidence. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to defendant to articulate some nondiscriminatory reason for the adverse action. Plaintiff must then prove that the reason put forth by the defendant was a

---

[4]*McDonnell Douglas v. Green,* 411 U.S. 792 (1973).

mere pretext for discrimination.

EDS contends that Plaintiff cannot demonstrate that he was discharged in order to interfere with his attainment of LTD benefits.  The Court finds that the handling of Plaintiff's LTD claim occurred after he was told he was discharged.  On October 22, 2002 Plaintiff submitted his claim for LTD benefits.  (Metlife's Motion, Ex. H).  Plaintiff argues that a reasonable jury could, at least in part, for the purpose of interfering with Plaintiff's attainment of his LTD benefits because of Swykert's false statement that EDS was not accommodating Plaintiff because of his disability prior to January 15, 2002 and because of the release that EDS attempted to obtain from him.

The Court finds that Plaintiff's evidence noted above does not create a genuine issue of material fact, particularly because EDS has presented evidence demonstrating that Plaintiff was discharged due to a reduction in workforce.  Further, another Infrastructure specialist, Stella Noskina was notified of her termination on the same day as Plaintiff, and there was no evidence that she suffered from a disability. (Swykert's dep. pgs. 55-55; Swykert Decl. ¶12).   Lastly, the Court finds that it undisputed that Plaintiff submitted his LTD claim after he was informed of his discharge.  The Court finds that Plaintiff has failed to set forth a *prima facie* case for unlawful interference under Section 510.  The Court grants EDS' motion for summary judgment on Plaintiff's Section 510 ERISA claim because there is no genuine issue of material fact as to whether Plaintiff was discharged in order to interfere with his attainment of LTD benefits.

**3.      Metlife's Motion to Affirm the Administrator's Decision with Regard to the LTD Benefits**

On October 22, 2002 Plaintiff submitted his claim for LTD benefits.  (Metlife's Motion,

Ex. J).  Metlife after reviewing Plaintiff's claim, concluded that although Plaintiff suffered from

MS, the disease had not progressed to a degree that rendered him unable to perform his job as an

infrastructure specialist at EDS as of the afternoon of January 15, 2002.  (*Id.* at 139).  Metlife

concluded that on January 15, 2002, Plaintiff was able to earn more than 80% of his

PreDisability earnings as defined by the Plan, and his earnings loss was the direct result of his

employer's workforce reduction and not of his illness.  (*Id.*).

On March 13, 2003 Metlife sent Plaintiff a denial letter which provided that Plaintiff may

request a review of this claim in writing within 180 days of the letter.  (*Id.* at 140).  The Plaintiff

has <u>not</u> appealed his denial of LTD benefits.

In *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609 (6th Cir. 1998), the Sixth

Circuit set forth a procedural framework for wrongful denial claims for benefits under ERISA

covered employee benefit plans.  The Court in *Brooks v. General Motors Corporation,* 203

F.Supp.2d 818 (E.D. Mich. 2002) explained and applied the *Wilkens* procedure and stated the

following:

> However, pursuant to *Wilkens v. Baptist Healthcare System, Inc.,* in a majority decision,
> the  panel in *Wilkens* has set forth "Suggested Guidelines" to adjudicate ERISA actions.
> The Sixth Circuit states that the Rule 56 Summary Judgment procedure is 'inapposite to
> the adjudication of an ERISA action' because of the Circuit's 'precedents [which]
> preclude an ERISA action from being heard by the district court as a regular bench trial.
> '[I]t makes little sense to deal with such an action by engaging in a procedure designed
> solely to determine whether there is a genuine issue for trial.'  The district court should
> not use neither the summary judgment nor the bench trial procedures in deciding ERISA
> actions.  As to the merits of the case, the district court should conduct a review based
> solely upon the administrative record and render findings of fact and conclusions of law.
> If  a procedural challenge is alleged, such as lack of due process afforded by the
> administrator or bias on its part, only then may the district court consider evidence
> outside the administrative record, and, if there is a procedural due process claim against
> the administrator, discovery is limited to evidence related to procedural challenges.

*Id.* at 822-823 (citations omitted).

The Court, based upon Sixth Circuit precedent, finds that the summary judgment procedure under Rule 56 is not appropriate. The Court applies the *Wilkens* procedural framework and conduct a review solely based upon the administrative record. As the Court stated in *Biondo v. Life Insurance Company of North America,* 116 F.Supp.2d 872 (E.D. Mich. 2000):

> As to the merits of the claim, the *Wilkens* court instructed district courts to conduct a '*de novo*' or 'arbitrary and capricious' review based solely upon the administrative record and render 'findings of fact' and 'conclusions of law' accordingly. In so doing, the court may consider the parties' arguments concerning the proper analysis of the evidence contained in the administrative record. However, it may not admit or consider evidence not presented to the administrator except where there is a procedural challenge to the administrator's decision, such as lack of due process afforded by the administrator or alleged bias on its part. (Pre-hearing discovery should also be limited to such procedural challenges.).

*Id.* at 873.

The Court notes that Plaintiff has not alleged that he was denied procedural due process or that there was bias on the part of Metlife which would require additional discovery. The Court also notes that Plaintiff argues that the Court should stay this proceeding because the Court's review of the STD claim will affect the outcome of his LTD claim. Plaintiff argues that EDS' decision to deny STD benefits is inextricably connected to his claim for LTD benefits. Plaintiff argues that the "administrative record" in this case will not be complete and subject to review by Metlife until there has been a full adjudication of his wrongful denial of benefits claim against EDS. (Plaintiff's Metlife Response, pg. 3). Plaintiff requests that the Court stay the proceedings on Plaintiff's wrongful denial of benefits claim pending: (1) adjudication of Plaintiff's wrongful denial of STD benefits against EDS, and (2) Plaintiff's subsequent exhaustion of the appellate procedure called for in the LTD plan. (Plaintiff's Metlife Response, pgs. 3-4). The Court denies Plaintiff's request.

The Court finds that eligibility for LTD benefits is not dependant on the STD plan or eligibility for STD benefits under *Wilkens.*  Plaintiff argues that Swykert misinformed Metlife about EDS' past history of accommodations, and EDS also directed Metlife to apply policy language that appears not to have been part of the STD policy until May 31, 2002.  The Court finds these two contentions did not provide the basis for Metlife's denial.  Further, the Court finds as stated above, that Plaintiff was not entitled to STD benefits under the terms of the policy.  The Court finds that these allegations are insufficient for it to disregard *Wilkens,* and stay this proceeding.

The Court finds that under *Wilkens,* the Court's review is limited to the administrative record unless there is a procedural challenge to the administrator's decision.  Thus, the Court finds that Plaintiff's argument also fails because under *Wilkens,* the Court's review of Plaintiff's claim is confined to the evidence contained in the administrative record.  Further, there is a different legal standard under ERISA with the LTD claim because the STD claim is reviewed under Michigan law.  As explained below, the LTD plan is governed by ERISA, and unlike the STD plan, it is subject to an arbitrary and capricious standard of review.

The Supreme Court in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989) set forth the standard of review applicable to an administrator's decision to deny benefits under an ERISA-covered plan:

> a denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Id.* at 115.

Instantly, the LTD plan provides that:

the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation was arbitrary and capricious.

(Metlife's Ex. A, pgs. 44-45).

Based on the LTD's language above, and pursuant to *Firestone,* the Court applies an arbitrary and capricious standard of review to Plaintiff's claim.  A plan administrator's decision is not arbitrary and capricious when it is "rational in light of the plan's provision" and as explained by the Sixth Circuit in *Smith v. Ameritech,* 129 F.3d 857 (6th Cir. 1997):

When applying this deferential standard, we must decide whether the plan administrator's decision was 'rational in light of the plan's provisions.'  In other words: 'When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'  In conducting this review, we 'consider only the facts known to the plan administrator at the time he made his decision.'

*Id.* at 863-864.

Further:

[u]nder the arbitrary and capricious standard, the administrator's claim can be overturned only upon a showing of internal inconsistency, bad faith, or some similar ground.  If the plan administrator's decision is rational in light of the plan's provisions and reasonable with no abuse of discretion, then it must be upheld.

*Racknor v. First Allmerica Financial Life Insurance Company,* 71 F.Supp.2d 723, 729 (E.D. Mich. 1999) (internal citations omitted).

In support of Plaintiff's LTD claim, he submitted:

(1) Employee statement;

(2) August 1, 2002 office note dictation of Stanton Elias, MD;

(3) Attending Physician Statement signed by Dr. Elias dated December 10, 2002;

(4) Letter from Dr. Elias dated December 10, 2002.

26

(Metlife's Response, Ex. J, p. 135).

In reviewing Plaintiff's LTD claim, Metlife also reviewed the information which was used in its review of Plaintiff's STD claim:

     (1) Dr. Elias' October 19, 2002 office note;

     (2) January 15, 2002 memo signed by Bill Fulk, MD;

     (3) Certification of Health Care Provider Form dated January 24, 2002 signed by Dr. Fulk;

     (4) Client job description as presented by Mr. Joe Swykert of EDS;

     (5) Plaintiff's counsel's letter dated March 27, 2002 with attached exhibits A through D;

     (6) Plaintiff's counsels letter dated April 12, 2002 with enclosed note from Dr. Elias dated November 7, 2001;

     (7) Plaintiff's counsel's letter dated April 12, 2002 with enclosed letter from Plaintiff;

     (8) Letter dated April 16, 2002 from Dr. Davis;

     (9) Plaintiff's counsel's letter dated April 29, 2002

     (10) Plaintiff's counsel's letter dated May 3, 2002.

(*Id.* at 136).

As stated previously, Dr. Davis submitted a report in support of Plaintiff's STD claim on April 16, 2004.  (*Id.* Ex. Q, pg. 227).   Also, Dr. Stanton Elias, Plaintiff's treating neurologist provided medical certification and  written support of Plaintiff's application for disability benefits.  (Admin. Rec. Ex. B, pg. 155; Ex. C, pg. 293; Ex. D, pgs. 158-159).  Dr. Elias examined Plaintiff in October 2000 and August 2002 and stated that Plaintiff would have "continuously fulfilled disability criteria at all times between those two examinations."

(Plaintiff's EDS Response, Ex. B).

Plaintiff's counsel sent several letters to Metlife in support of Plaintiff's claim.

Plaintiff's counsel's letter of March 27, 2002 noted that the Social Security Administration

recognized the disabling condition of Plaintiff's illness.  The letter stated:

> In my experience of handling ERISA/wrongful denial of disability benefit claims, disability plans usually consider an award of Social Security Disability benefits to be very significant in their decision of how they will responded to a wrongful denial of benefits claim.  Usually, in this situation, the disability plan recognizes that it is possible that one of their claims examiners could have dropped the ball.  They recognize that they have a moral obligation, as well as a legal obligation, to provide benefits to the participants who have paid into that plan over the years, and are entitled to those benefits, rather than shirking the duties and obligations owed to the plan participant in favor of sticking up for or defending the claims examiner.

(Admin. Rec. pg. 262).

As Plaintiff has noted, Metlife's denial of LTD benefits letter relied in part on a "Job

Description Statement" submitted by Swykert to Metlife.  (Plaintiff's EDS Response, Ex. R).

Plaintiff notes that Swykert's "Job Description" made no mention of EDS' accommodations

made on behalf of Plaintiff.  Metlife during its investigation sought clarification and Mr. Bartmes

questioned Swykert regarding the level of accommodation for Plaintiff.  (*Id.* Ex. T).  The

recorded notes of that conversation provide as follows:

> [Swykert] indicated that he wasn't quite sure how to measure that, but that he would provide as complete a picture he could regarding the [Plaintiff's] work situation. [Swykert] stated that from the time [Plaintiff] reported to him, [Plaintiff] worked from home.  As for working half of the year from Florida and half from Michigan, that was in effect for a few years preceding 1/15/02. [Swykert] stated that it was not at all unusual for employees within his division, to work from home. [Swykert] does not therefore think of allowing [Plaintiff] to work from home as an 'accommodation' per se...

(*Id.* at 131).  The Court finds that regardless of whether Swykert misinformed Metlife, the thrust

of Metlife's decision was not based upon that misinformation.

As previously set forth, Metlife sent Plaintiff's medical records to Dr. Joseph J. Jares, III. Previously, in processing Plaintiff's claim for STD benefits, Dr. Jares reviewed Plaintiff's claim file. On March 6, 2002, after review of the documents in Plaintiff's file at that point, Dr. Jares concluded:

> Based on the medical records, from a neurology perspective, Mr. Tabor has a moderate impairment due to objective findings. The objective findings include his physical examination demonstrating spasticity in his left upper and both lower extremeties, hyperreflexia, and extensor plantar signs. He has moderate dysmetria on finger-to-nose maneuver , and very unsteady gait. He has reduced vibration, proprioceptive function, and reduced temperature sensation in his lower extremities. Specific test results are not submitted. Mr. Tabor retains the ability to work at a sedentary position. He does have cognitive complaints, but these are not substantiated by the results of any neuropsychological testing. Mr. Tabor would need to avoid working at heights or around heavy machinery due to his neurological symptoms of unsteady gait. He would also need to avoid exposure to high environmental temperatures because of the potential of worsening his MS symptoms. The medical records submitted regarding Mr. Tabor are quite scant. His previous neurological care is not submitted.

(Metlife's Response, Ex. E, p. 287).

Dr. Jaros provided further:

> There is no documented change in Mr. Tabor's neurological status that would suggest that he was unable to perform a sedentary job as of the afternoon of January 15, 2002.

(*Id*).

On May 6, 2002, Dr. Jares issued another report after he received additional medical evidence from Plaintiff. Dr. Jares provided:

> The additional information submitted includes an office memo addressed to Sam Morgan, [Plaintiff's] Attorney dated 03/25/02 and written by Bill Fulk, M.D. regarding Mr. Tabor's clinical status. The second piece of information is a letter dated 04/16/02, addressed To Whom it May Concern, written by Edward L. Davis, D.O. The third piece of information consists of a 2-page summary of Mr. Tabor's difficulties with daily activity. The author nor date of this summary is not given. It appears from the information submitted that the office memo written by Dr. Fulk is a recitation of the points made in the 2-page summary, and does not appear to be completely original. One might assume it was written by Mr. Tabor or a friend or family member and submitted to

Dr. Fulk in an attempt to produce his memo.  It is not disputed that Mr. Tabor has impairment due to his multiple sclerosis.  It is unclear, however, why his condition changed so abruptly on 01/15/02 that he was no longer able to do the activities he had been doing up until that date.

There is no concrete or specific clinical information submitted that would shed light on why his functional capacity changed at that point.  If there is other information available regarding his functionality, I would be happy to review this.  The new information submitted does not change my previously submitted opinion of 3/06/02.

(*Id.* Ex. F, pgs. 213-215).

In February, 2003 Plaintiff submitted additional materials in support of his claim for LTD benefits.  On February 12, 2003, Dr. Jares issued his final report and concluded:

The new clinical information submitted does not change my previously submitted opinions in that mainly Mr. Tabor has been capable of working in a sedentary position.  There are no reports of any abnormal cognitive findings.  Fatigue is a non-quantifiable complaint.

There is no doubt that Mr. Tabor has some degree of disability from his multiple sclerosis but there has not been a dramatic change documented, particularly around the time of January of 2002, which would indicate sudden loss of function.  It appears that the August 2002, office visit was the most recent visit Mr. Tabor has had, extending back over a year.  This would suggest that his  multiple sclerosis has not dramatically worsened.

(*Id.* Ex. G, p. 148).

On March 13, 2002, Metlife denied Plaintiff's claim for LTD benefits.  The denial letter provided:

Taking all of the available information concerning your client's employment and your client's illness into consideration, we find that his illness did not contribute to his loss of income in January of 2002.  Your client suffers from the disease multiple sclerosis, and has suffered from that illness since 1982.  His disease has undoubtedly progressed since it was diagnosed and will undoubtedly progress further in future years.  However, it did not progress to the degree that rendered him unable to perform his job as an infrastructure specialist for EDS as of the afternoon of January 15, 2002.

(*Id.* Ex. J, pg. 139).

The denial letter set forth that Metlife's LTD policy requires that in order to be eligible for LTD benefits, Plaintiff had to be unable to earn more than 80% of his Predisability Earnings at his own occupation for any employer in the local economy during the elimination period (six months) and continuing for the next 24 month period.  (*Id.* at 135).  The letter further stated that the loss of earnings must be a direct result of Plaintiff's sickness, or accidental injury and not from economic factors.  (*Id.*).

Regarding Dr. Elias's conclusion that Plaintiff was unable to work at his own job beginning in October 2000, the letter provided:

> While it is clear that Dr. Elias is more familiar with your client's medical history than Dr. Fulk, Dr. Davis, or Dr. Jares, it is of singular significance that Dr. Elias chooses to state quite clearly and adamantly that your client has been totally disabled from October 2000 through the present.  We have no information to support the fact that your client was unable to work at his own job from October 2000 through his date of separation.  Your client did work at his own job from October 2000 through January 15, 2002.  If EDS were accommodating your client significantly beginning in or around October 2000, Dr. Elias's opinion could appear to be consistent with the facts.  However, the information provided by EDS concerning your client's employment history with the company is not in the least consistent with Dr. Elias's assertion that your client has been disabled from performing his job since October of 2000.

(*Id.* at 138).

Lastly, the letter reiterated Swykert's statements that Plaintiff received no special accommodations in consideration of his employment.  The letter stated:

> Mr. Swykert also indicated that it is not unusual for employees within your client's division who performed the same position as your client to work from home.  Mr. Swykert had employees who worked from home only part of the week and employees who worked from home on a permanent basis much like your client.  Moreover, Mr. Swykert advised us that it is not uncommon for employee's (sic) within your client's division to work from home outside of Michigan just as your client worked from Florida part of the year.  Mr. Swykert provided examples of employees who  report to him from Ohio, New York, and Illinois.  All three of these employees worked in the same division as your client.  Mr. Swykert went on to state that work was never assigned differently to Mr. Tabor than it was to other infrastructure specialists in consideration of his illness and

31

that expectations were no different for Mr. Tabor.  In fact, Mr. Swykert stated that Mr.
Tabor never addressed the influence of his illness had over his work until January 15,
2002, when he was notified that his job at EDS was eliminated.

(*Id.* at 138-139).

The denial letter advised Plaintiff that he could appeal the denial decision, but Plaintiff

never  appealed the decision.

Metlife contends that no doctor provided any objective medical evidence that Plaintiff

suffered a change in condition such that he was unable to earn 80 percent of his PreDisability

earnings the afternoon of January 15, 2002, the last day he had coverage under the LTD plan.

While there is dispute among Doctors Fulk, Davis and Jares as to whether Plaintiff was

medically disabled, the Court finds that Metlife's determination of "Disability" as defined under

the LTD plan was rational and not arbitrary and capricious.  The LTD plan defines "Disability"

as follows:

'Disabled' or 'Disability' means that, due to sickness, pregnancy or accidental injury,

you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis;

1.  during your Elimination period[5] and the next 24 month period, you are unable to earn
more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your
Own Occupation for any employer in your Local Economy; or

2.  after the 24 month period, you are unable to earn more than 60% of your Indexed
Predisability Earnings from any employer in your Local Economy at any gainful
occupation for which you are reasonably qualified taking into account your training,
education, experience and Predisability Earnings.

Your loss of earnings must be a direct result of your sickness, pregnancy or accidental

_____

[5]The "Elimination Period" is defined in the policy as follows: Your Elimination Period
begins on the day you become Disabled.  It is a period of time during which no benefits are
payable.  Your Elimination Period is shown in Plan Highlights.  You must be under the
continuous care of a Doctor during your Elimination Period....

injury.  Economic factors such as, but not limited to, recession, job obsolescence, paycuts and job sharing will not be considered in determining whether you meet the loss of earnings test.

(Admin. Rec. pg. 8, LTD Plan).

The Court finds it determinative that Plaintiff earned his full salary until he was discharged from EDS.  The Court finds that Plaintiff cannot establish that he was separated from EDS because of a health condition.  Therefore, the Court finds that he cannot demonstrate that he was unable to earn 80% of his salary due to his health condition because he continued to work at EDS earning a full salary until he was discharged by EDS.  Based upon this finding, the Court holds that Metlife's denial was rational in light of the policy's provisions.

Metlife also contends that Plaintiff's claims must be dismissed because he failed to exhaust available appeal procedures.  The Court finds that the Sixth Circuit requires that a plaintiff seeking benefits in an ERISA case exhaust his administrative remedies before commencing litigation.  *Miller v. Metropolitan Life Insurance Co.,* 925 F.2d 979, 986 (6th Cir. 1991).

The March 13, 2003 denial letter set forth the following:

Appeal Rights:

Because your claim was denied in whole or in part, you may appeal this decision by sending a written request for appeal to Synchrony Appeals, PO Box 94452, Palatine, IL 60094-4452 within 180 days after you receive this denial letter.  Please include in your appeal letter the reason(s) you believe the claim was improperly denied, and submit any additional comments, documents, records or other information relating to your claim that you deem appropriate for us to give your appeal proper consideration.  Upon request, Metlife will provide you with a copy of the documents, records, or other information we have that are relevant to your claim and identify any medical or vocational expert(s) whose advise was obtained in connection with your claim.

Metlife will evaluate all the information and advise you of our determination of your appeal within 45 days after we receive your written request for appeal.  If there are

33

special circumstances requiring additional time to complete our review, we may take up to an additional 45 days, but only after notifying you of the special circumstances in writing.  In the event your appeal is denied in whole or in part, you will have the right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974.

(Metlife's Motion, Ex. J pg. 140).

The Court finds that Plaintiff's claim also fails because he did not appeal Metlife's administrative decision.  Plaintiff contends that because Metlife's decision to deny LTD benefits was inextricably tied to the positions asserted by EDS when directing Metlife in the administration of Plaintiff's STD claim, it was impracticable for him to appeal the LTD denial until the STD claim was resolved by this Court. Plaintiff also alleges in his complaint that appealing Metlife's decision to deny LTD benefits under the circumstances would be an exercise in futility.  (Complaint ¶83).  The Court, however, finds that Sixth Circuit precedent holds that the Plaintiff must exhaust his administrative remedies.  Futility has been recognized as an exception to ERISA's exhaustion requirement, however, it is has been rarely found.  The Eleventh Circuit in *Springer v. Wal-Mart Group Health Plan.,* 908 F.2d. 897 (11th Cir. 1990) suggested that:

> an example of evidence of futility which would support a district court's exercise of discretion in excusing a plaintiff's failure to exhaust administrative remedies see *Curry,* 891 F.2d at 846 (defendant 'controlled the plan's administrative review procedures and exercised its control to deny plaintiff meaningful access to those procedures.'  There is no claim in this case that [defendant] denied [plaintiff] access to the Plan's appeal process.

*Id.* at 901.  Similarly here, there is no evidence that Plaintiff was denied meaningful access to the LTD plan's appeal process.  Therefore, the Court finds that Plaintiff has failed to demonstrate that his appeal would have been futile.

Plaintiff also argues that if this Court were to dismiss this action on the basis that he

34

failed to exhaust his administrative remedies, it should do so without prejudice.  In *Ravencraft v. UNUM Life Ins. Co. of America,* 212 F.3d 341 (6th Cir. 2000) the Sixth Circuit found that the district court erred when it dismissed the plaintiff's case with prejudice on the grounds that he failed to exhaust his administrative appeal rights.  The Sixth Circuit found that the district court should have dismissed the case without prejudice.  However, important to the Court's decision was that the sole reason for the plaintiff's dismissal was one failure to exhaust his administrative remedies grounds.  Under these circumstances, the Sixth Circuit found that a dismissal without prejudice is warranted.  On the other hand, when dismissal is warranted on the merits as well as procedural grounds, the Sixth Circuit held a dismissal with prejudice is warranted.  *Id.* at 344 (quoting *Baxter v. C.A. Muer Corp.,* 941 F.2d 451, 456 (6th Cir. 1991).  In the instant case, the Court finds that Plaintiff's claim is properly dismissed upon the merits <u>and </u>his failure to exhaust his administrative remedies. Therefore, the Court dismisses Plaintiff's claims with prejudice.

## **CONCLUSION:**

For the reasons set forth above, the Court:

(1) GRANTS EDS' Motion for Summary Judgment; and

(2) GRANTS Metlife's Motion to Affirm the Administrator's Decision with Regard to Long Term Disability Benefits.

**SO ORDERED.**                              /s/ Paul D. Borman                                 
                                                         PAUL D. BORMAN
                                                         UNITED STATES DISTRICT JUDGE

Dated:  April 27, 2005

CERTIFICATE OF SERVICE
Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 27, 2005.

s/Jonie Parker                                        
Case Manager